LAW OFFICES OF
# JEFFREY LICHTMAN
441 LEXINGTON AVENUE
SUITE 504
NEW YORK, NEW YORK 10017
www.jeffreylichtman.com

JEFFREY LICHTMAN
JEFFREY EINHORN
MATTHEW COHAN

PH: (212) 581-1001
FX: (212) 581-4999

January 15, 2025

**BY ECF**
Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re: <u>United States v. Alan Williams</u>, S1 22 Cr. 675 (PGG)

Dear Judge Gardephe:

**A.**     **INTRODUCTION**

    This letter is submitted on behalf of defendant Alan Williams in anticipation of his February 7, 2025 sentencing. With this letter, the defendant respectfully requests a non-custodial sentence, which is "sufficient, but not greater than necessary to comply with the purposes" set forth in 18 U.S.C. § 3553(a)(2) due, in part, to the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

    The basis for this request is as follows: ███████████████



Jeffrey Lichtman

Hon. Paul G. Gardephe
United States District Judge
January 15, 2025
Page 2



In addition, the government has frozen accounts holding over $18M in funds, including approximately $6M that was lawfully earned by Mr. Williams during a lifetime of employment in the financial services industry, and yet was commingled with criminal proceeds. It is unclear how much of this money, if any, will be released to him as a result of his conviction.

*Second*,

*Third*, a survey of recent sentences received by defendants in the Southern and Eastern Districts of New York in white collar fraud cases reveals that significant downward variances are commonplace, even in cases with aggravating factors not present here and without the aforementioned medical issues and other mitigation specific to Mr. Williams.

*See* United States v. Billimek, 22 CR 675, ECF Dkt. No. 86 ("Billimek Sentencing Transcript") at T 32.

And *fourth*, a review of the defendant's life finds that there are many good deeds and the prospects for his rehabilitation are very good.

### B. THE DEFENDANT'S GUILTY PLEA AND RESULTING GUIDELINES RANGE

On September 6, 2023, Mr. Williams pleaded guilty to Counts One through Four of a four count Superseding Information which charged him with Conspiracy to Commit Securities Fraud, in violation of 18 U.S.C. § 371 (Count One); Securities Fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff (Count Two); Wire Fraud, in violation of 18 U.S.C. § 1343 (Count Three); and Conspiracy to Commit Bank Fraud, in violation of 18 U.S.C. § 1349 (Count Four).

JEFFREY LICHTMAN

Hon. Paul G. Gardephe
United States District Judge
January 15, 2025
Page 3

▇▇▇▇ Mr. Williams faces no mandatory minimum and a statutory maximum sentence of 75 years imprisonment. Id. at p. 2.

As recounted in the PSR, Counts One through Four are grouped together for guidelines calculation purposes because the offense level is determined largely on the basis of the total gain or loss. PSR at ¶ 45. Because Counts One and Two produce the highest offense level (they utilize the same guideline), they are utilized in determining the sentencing guidelines. Pursuant to U.S.S.G. § 2B1.4, the base offense level for Securities Fraud is 8 (PSR at ¶ 46) and because the $47M gain from the offense was more than $25M, but less than $65M, 22 levels are added, resulting in an adjusted offense level of 30. PSR at ¶¶ 47, 51; U.S.S.G. § 2B1.1(b)(10)(L). With three offense levels subtracted for acceptance of responsibility (U.S.S.G. § 3E1.1) and two offense levels subtracted due to the defendant's lack of criminal history (U.S.S.G. § 4C1.1), the total offense level becomes 25, carrying an advisory sentencing range in the Criminal History Category I of 57-71 months imprisonment.[2] PSR at ¶¶ 55, 106.

### C.   OBJECTIONS TO THE PSR

On January 8, 2024, counsel filed a second round of objections to the PSR and the Sentencing Recommendation disclosed by Probation. These objections specifically addressed additions to the initial disclosure of the PSR as well as Probation's recommendation, which he previously had no opportunity to address. While Probation has acknowledged receipt of these additional objections, no addendum to the PSR or Sentencing Recommendation has since been issued, and as such, they are reproduced below in full.



---

[2] In addition to the lengthy prison sentence that he faces, the government froze over $18M in multiple accounts belonging to Mr. Williams concurrent with his arrest in this case. Approximately $6M of these funds predate the defendant's participation in this scheme and are a result of his years of lawful employment in the financial sector, however, because these monies were commingled with criminal proceeds, it is unclear if any of these funds will be returned to him.

**JEFFREY LICHTMAN**

Hon. Paul G. Gardephe
United States District Judge
January 15, 2025
Page 4



PSR at ¶¶ 96-100 & Sentencing Recommendation at pp. 31-32: The section detailing Mr. Williams' assets contains multiple inaccuracies and there should be no concern regarding the "forthrightness as to the disclosure of financial information." See Sentencing Recommendation at p. 31. Any question as to Mr. Williams' financial disclosure owes to misunderstandings as to: 1) the accounts related to the securities fraud; 2) the defendant's shared financial arrangement with his live-in partner and ex-wife – and her children who consider him to be their father; and 3) the assets that the government indicated Mr. Williams could sell following his arrest in order to pay for living expenses during the pendency of this case.

*First*, Mr. Williams does not "receive[] significant benefits from ... the Alan Williams Income Trust." Sentencing Recommendation at p. 31. As counsel advised Probation during the Presentence Interview, this account was not actually related to a trust, it was just the name of one of the trading accounts utilized by Mr. Williams as part of the conspiracy. He receives no benefit from this account, it was frozen by the government and he has no access to its contents. Additionally, there is no trust paperwork for this account (PSR at ¶ 96), it is merely a trading account that was established many years ago by the defendant's father with this name. Further, any assertion that Mr. Williams has some undisclosed source of income related to this trust is simply a misunderstanding of the accounts that were frozen by the government concomitant with the defendant's arrest. To be clear, Mr. Williams had five accounts frozen by the government: two Charles Schwab trading accounts which were utilized in the conspiracy, and three checking accounts with JP Morgan Chase which received funds from the trading accounts. Mr. Williams' only usable bank account at present is the Wells Fargo account in his name with some $2,900 in funds. See PSR at ¶ 95.

JEFFREY LICHTMAN

Hon. Paul G. Gardephe
United States District Judge
January 15, 2025
Page 5

*Second*, Mr. Williams has only a single steady source of income at present – his $1,639 in Social Security retirement benefits. And while he reports approximately $7,127 in monthly expenses, the deficit is covered by funds from his girlfriend and partner, Karen Williams[3] and from assets that the government previously indicated that they would not object to his liquidating for living expenses: a summer home and his vehicle. And while Karen Williams is an unemployed homemaker, she has also received multiple transfers and deposits from her daughter, Nina Fox, totaling $49,100 from February 2024 through November 2024.[4] This money was intended for both her mother and Mr. Williams to assist with their expenses, including the mortgage and utilities – and it was used for these purposes. Additionally, the claim that Mr. Williams is under-reporting his expenses is nonsensical. Indeed, the initial cash flow statement that he provided to Probation included shared expenses for the children who live in his house and whom he considers his own – and Probation asked him to revise the statement so that it specifically did not include these additional expenses.

*Third*, as noted above, the government indicated that it would not object to Mr. Williams liquidating certain non-frozen assets for living expenses. Mr. Williams thereafter sold his vacation home in Manzanita, Oregon for $855k and a 2021 Porsche Macan for $51k. The proceeds from the sale of both were placed in Ms. Williams' Wells Fargo account and they were utilized for living expenses. Mr. and Ms. Williams have utilized these funds to cover the deficit in his monthly living expenses – there is no secret source – and the government was made aware of and did not object to these sales.

PSR at ¶ 98: Probation's allegations of potentially fraudulent activity in this paragraph regarding the sale of the defendant's vacation home are entirely misplaced. As noted above, the government indicated that it would have no objection to Mr. Williams selling this property to aid with living expenses. This is the property noted on the Final Seller's Statement located at 8775 Chinook Lane in Manzanita, Oregon that was previously provided to Probation – the Montana address that Probation mistakenly claims is at issue is instead the home address of the buyers.[5] Further, as there was no lien on the property and it was not seized by the government, Mr. Williams sold the home – as he was permitted to – and the proceeds from the sale were placed in Ms. Williams' Wells Fargo account for use in paying their home mortgage and other expenses.

---

[3] Ms. Williams was previously married to the defendant, divorced and then reconciled. She never changed back to her maiden name.

[4] A payment history from Zelle was provided to Probation.

[5] Probation is in possession of the May 1, 2023 Final Seller's Statement concerning this transaction, which makes clear which property was sold.

JEFFREY LICHTMAN

Hon. Paul G. Gardephe
United States District Judge
January 15, 2025
Page 6

Finally, the defendant had no relation to the sellers in this arm's length transaction and any intimation to the contrary by Probation is wholly unfounded.



E. **THE DEFENDANT'S BACKGROUND AND THE NATURE OF THE OFFENSE – APPLICATION OF § 3553(a) FACTORS**

Since the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), the Sentencing Guidelines have been rendered advisory in nature, leaving sentences to the district court's discretion, guided by the Guidelines and the other factors contained within 18 U.S.C. §

**JEFFREY LICHTMAN**

Hon. Paul G. Gardephe
United States District Judge
January 15, 2025
Page 7

3553(a) and bounded by any applicable statutory minimum and maximum. This Section directs sentencing courts to "impose a sentence" that is "<u>sufficient, but not greater than necessary</u>, to comply with" the "need for the sentence ... to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; [and] to protect the public from further crimes of the defendant ...." 18 U.S.C. §3553(a)(1)-(2) (emphasis supplied). In making this determination, courts are to consider "the nature and circumstances of the offense and the history and characteristics of the defendant ...." 18 U.S.C. § 3553(a)(1).



JEFFREY LICHTMAN

Hon. Paul G. Gardephe
United States District Judge
January 15, 2025
Page 8



###    ii.    The Sentence Received by Billimek and His Role Compared to Mr. Williams

On May 20, 2024, Your Honor sentenced Mr. Williams' co-conspirator, Lawrence Billimek, to 70 months imprisonment, the bottom of his guidelines range of 70 to 87 months. See Billimek Sentencing Transcript at T 32. In declining to vary from Billimek's sentencing guidelines, Your Honor noted multiple aggravating factors: Billimek paid off his claimed credit card debts and loans with the early proceeds from the conspiracy before continuing on to amass significant wealth through his crimes, resulting in his holding eight properties in "Hawaii, Austin, San Antonio, Texas, Idaho, and Oregon." Id. at T 31; Government's May 13, 2024 Sentencing Letter for Billimek ("Govt's Sentencing Ltr. for Billimek"), ECF No. 71, at pp. 1, 3 ("when he was faced with financial difficulties, [Billimek] chose to orchestrate for the next six years a complex, calculated, insider trading scheme"). Billimek thereafter accumulated some $12M in assets as a result of his crimes. Id.

Additionally, Billimek abused his position of trust with his employer to gather and share trading information with Mr. Williams that was used for the scheme. See Govt's Sentencing Ltr. for Billimek, at p. 1. Further, there were multiple allegations that Billimek was not fully forthcoming with Probation's investigation of his finances even after he admitted his guilt. Id. at p. 8 ("[T]he Probation Office expressed significant and warranted concern about the defendant's lack of complete candor in explaining his financial status. ... it appears that it took [them] multiple rounds with the defendant to understand the layers of LLCs he had set up to own and sell his real estate holdings").

Notably, in determining that joint and several liability for restitution was appropriate – which Mr. Williams does not contest – Your Honor "f[ound] Mr. Billimek and Mr. Williams to be equally culpable." Id. at T 37. While they may be equally responsible for the crimes they committed together, Messrs. Billimek and Williams were not equal partners in the profits they generated – and the government has indicated that Billimek was "the most culpable actor in the

JEFFREY LICHTMAN

Hon. Paul G. Gardephe
United States District Judge
January 15, 2025
Page 9

conspiracy ...."[6] For example, Mr. Williams initially only retained enough of the proceeds from the scheme to cover taxes on the gains from the trades, an arrangement which later shifted to Mr. Williams keeping 10% of the profits (i.e., 20% of the proceeds), sending 40% to Billimek, and retaining 50% for the payment of taxes, which he continued to pay until his accounts were frozen by the government, which occurred before he could contribute towards his 2022 state and federal returns. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Billimek, conversely, may have committed tax fraud, with the government indicating in their sentencing letter for him that "[d]espite the millions of dollars he stole, for tax years 2020, 2021, and 2022 ... Billimek reported total wages of between $260,000 and $300,000 per year." Govt's Sentencing Ltr. for Billimek, at p. 3.



### iii.   Recent Sentencings in White Collar Cases Support Our Request for Leniency

Recent white collar prosecutions in the Southern and Eastern Districts of New York support our request that Mr. Williams receive a significant sentencing variance in this case,

---

[6] See Govt's June 11, 2024 Letter, ECF No. 83, at p. 2 (emphasis supplied).

▉▉▉▉▉▉▉▉▉▉ See 18 U.S.C. § 3553(a)(6); Freeman v. United States, 131 S. Ct. 2685, 2694 (2011) (Sentencing Reform Act "aims to create a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences").

For example, in October 2024, Judge Liman sentenced brothers Michael and Gerald Shvartsman to 28 months and 22 months imprisonment, respectively, representing significant downward variances from their sentencing guidelines of 46 to 57 months and 37 to 46 months imprisonment despite their earning $18.2M and $4.6M from their crimes. See Stewart Bishop, Trump Media Investors Get Prison For Insider Trading, Law360, October 17, 2024, available at: https://www.law360.com/newyork/articles/1891297/trump-media-investors-get-prison-for-insider-trading (last viewed October 18, 2024). These substantial variances occurred even though Judge Liman called the brothers' insider trading scheme "brazen," and described Michael Shvartsman as "just greedy," as he was not young or desperate and was "already a wealthy man," when he and his brother embarked on an insider trading conspiracy involving Trump Media's becoming a publically traded entity. Id.

Additionally, United States v. Chalavoutis, the defendant pleaded guilty to conspiracy to commit mail fraud as it related to a $30M fraudulent prize scheme which was perpetrated through mass mailings requesting small processing fees. 18 CR 349 (JS) (EDNY), ECF Dkt. No. 157. Despite the defendant pleading guilty just one week before trial, and the defendant's facilitating the scheme by setting up shell companies, recruiting straw business owners, deceiving third parties to cover up the scheme, replacing closed bank accounts, and managing the finances, she received a sentence by Judge Seybert of just six months imprisonment, down from guidelines of 70 to 87 months. Id.; Dkt. No. 173.

In United States v. Bohm, Judge Seybert sentenced the defendant to a term of 24 months imprisonment, also a significant variance from his guidelines of 70-87 months and in significant contrast to the government's request for a guidelines sentence in that case. 18 CR 36 (JS) (EDNY), ECF No. 86. Bohm had been involved in a $8.9M mortgage fraud scheme wherein he and his co-conspirators lied to banks in order to receive loans to refinance properties when in fact the proceeds were diverted and utilized to pay down corporate debt. Id. at ECF No. 71.

Further, in United States v. Orlean, Judge Broderick sentenced defendant Keith Orlean to 34 months imprisonment, down from guidelines of 51 to 63 months. 18 CR 375 (VSB) (SDNY). Orlean had admitted to stealing $2M from investors in a telemarketing scheme that targeted the savings of elderly people via sales calls from a boiler room. And in United States v. Philbrick, Judge Stein sentenced Inigo Philbrick to 84 months imprisonment, down from guidelines of 121 to 151 months imprisonment. 20 CR 351 (SHS) (SDNY). Philbrick had admitted to stealing

$86M from art collectors and investors over a four year period and was accused of fleeing to the remote island of Vanuatu to avoid extradition to the United States from the United Kingdom.

In each of the above-referenced cases which had significant aggravating circumstances, defendants received a substantial variance from their sentencing guidelines. The same should be the case for Alan Williams, ▮

### iv.   The Character Letters

We have attached several character letters in support of this submission, reflecting the significant and meaningful role that Mr. Williams has played in the lives of friends and family members. It would be impossible to include a letter from every individual whom the defendant has positively influenced. Still, the myriad letters on which we do remark paint a consistent picture of a "dedicated father," (November 20, 2024 Letter of Nina Fox, attached as Exhibit C) a "mentor and friend," (Letter of Michael Landis, attached as Exhibit D) and a "kind, helpful person." Letter of Lea Thone, attached as Exhibit E; see also November 15, 2024 Letter of Brian Baylies, attached as Exhibit F ("loyal, supportive, and one who always puts his family and friends as a top priority"); November 15, 2024 Letter of Ariane Wirth, attached as Exhibit G ("an anchor to both family and friends"). Additionally, multiple writers observe Williams' regret and "profound remorse" for his criminal conduct. See, e.g., Letter of Don Whitaker, Jr., attached as Exhibit H; see also Ltr. of Michael Landis, Ex. D ("The first thing he does when we talk is apologize to me"); Ltr of Brian Baylies, Ex. F ("Alan has expressed to me during several conversations that he deeply regrets his actions ...."). Sadly, were it not for this sentencing, many of Mr. Williams exceptionally good deeds probably would have gone unrecognized.

#### A Dedicated Father

To begin, multiple of the submitted letters reference Mr. Williams' dedication as a father, taking care of not just his biological children, but the children of his ex-wife and partner, Karen Williams. See, e.g., Ltr. of Michael Landis, Ex. D ("I have consistently found Alan to be a great father to his children"). As explained in the PSR, when Mr. Williams began dating Karen Williams (nee Guldbeck) in 2000, she had one child, and Mr. Williams had two children from prior marriages. PSR at ¶ 68. The couple married in 2009 after dating for nine years, but were divorced in 2010. Id. They reconciled that same year when Ms. Williams (who did not change her name back to Guldbeck) became pregnant with twins by another man, Brian Greear, who would later come to live at their property in a cottage to help raise the children. PSR at ¶ 69. The twins of Brian Greear and Karen Williams consider the defendant to be their father and primary male parental figure.

JEFFREY LICHTMAN

Hon. Paul G. Gardephe
United States District Judge
January 15, 2025
Page 12

  In her letter to the Court, Karen Williams, who describes the defendant as "always ... supporting and caring as [her] partner," hails that his "dedication to [their] family is unwavering ...." December 7, 2024 Letter of Karen Williams, attached as Exhibit I. In explaining their unique situation, Ms. Williams adds:

> We have five children between us ranging from teens to adults. They all may not be biological, but we've blended our families nicely. Our youngest are boy/girl twins [S] and [L] who reside in our house along with the natural father who lives in a carriage house on our property. Our blended family works for us ....

Id.; see also Ltr. of Lea Thone, attached as Exhibit E ("good man, father and friend").

  Nina Fox, the child of Ms. Williams from a prior relationship, recalls in her letter to the Court when she met the defendant as a child and "how ... much of a dedicated father" he has been to her:

> When "Fred" and I met in 1999 I was at first apprehensive, as all children are when they meet their parents new significant other. That quickly wore off and I soon realized how prompt, funny and generous he was. He loved my mother so much and you could tell he was simply smitten by her. At the time, they lived in different counties, about 45 minutes in distance, and he would arrive to our home on Friday's and stay the next two nights up until the time I graduated from high school. <u>On Friday's every week he would arrive to our home earlier than my mother. I would be home already from school and we would sit for at least for an hour or two and he would consistently ask me about school, my friends, and we would talk about my interests.</u> ... He put his energy into getting to know me and allowed me to share my interests openly. I will fondly remember every Friday night going to "Tommy's Wok" Chinese food in Sausalito, CA.
>
> Once I graduated high school my mother, Karen Williams, and Fred relocated to Wilsonville, OR. I was of course sad but I understood why they moved. I would visit a few times a year on my breaks from school, a school that Fred generously contributed towards by tuition and we would still have our fun together. ... <u>My siblings were born in 2008, and as far as I am concerned Fred has and will always be their father. Despite not being their biological</u>

JEFFREY LICHTMAN

Hon. Paul G. Gardephe
United States District Judge
January 15, 2025
Page 13

> <u>father he has been there for them since birth and has shown them the same level of care, support and love that he has shared with all of his children</u>.

Ltr. of Nina Fox, Ex. C (emphasis supplied); <u>see also</u> Letter of Devin Williams, attached as Exhibit J ("taught me to be independent," and "set me up with the tools to become a better person ...."").

Brian Williams similarly recalls the support that he has received from his father throughout his life, as well the defendant's dedication to his mother, even after the two had divorced:

> My father has always deeply cared for my well being from a young age even removing me from an abusive part time living situation with my stepfather when I shared what was going on. When my mother was not able mentally to care for me at a young age, my father still made sure even after being divorced that he provided for her well past what the courts ordered. I can remember he would send me with money for my mom, so my previous stepmother would not know who would not have allowed it, just to make sure my mom and I were more than taken care of when I would visit with her and after I left. When my mother moved to Florida with my previous stepfather shortly after she left his abus[ive] ways my dad helped her move back to California, so I could be close to her. I think most fathers would have used that as an advantage, however, my dad helped me and my mom. I never heard my mother says anything bad about my father while she was alive, she just said that he stressed to much even excessively about working hard to leave enough money for his family to a point of not spending much on himself. He said so many times that his purpose is to build a nest egg for his family when he is gone because my grandpa grew up in poverty in Wales.

Letter of Brian Williams, attached as Exhibit K ("he taught me you work from the bottom up").

In her letter to the Court, friend Ariane Wirth recalls that Ms. Williams was living with her after she had given birth to her twins, and that while they had been recently divorced, Mr. Williams "dropped everything in Oregon and got in the car and drove all the way to [her] house in California." Ltr. of Ariane Wirth, Ex. G. Ms. Wirth explains:

JEFFREY LICHTMAN

Hon. Paul G. Gardephe
United States District Judge
January 15, 2025
Page 14

> Karen and the twins who were just 6 weeks old at the time, were
> staying with me and my husband. Alan arrived he stated "he loved
> them so much he was their protector and provider," [h]e further
> stated they belonged with him. The following day Alan loaded the
> babies and luggage up in the car and took them back to live with
> him. Since then he has followed through with his promise.

Id.; see also Ltr. of Bryan Greear, attached as Exhibit L ("He has always been good to [my biological] kids and has always been there to support their needs emotionally and financially").

Finally, S.G., one of the defendant's twins, writes in her letter: "Alan Williams is my father[,] [o]r as I prefer to call [him,] 'Papa.'" December 1, 2024 Letter of S.G., attached as Exhibit M ("Alan Williams is the one who raised me"). S.G. adds in her letter that Mr. Williams "took care of [her] like [she] was his own," and that he "took [her] mother, Bryan Greear, and [her] brother and [her] under his wing and gave [them] a place to call home." Id.

A Friend and Source of Support to Others

In light of the foregoing messages from family members, it should come as little surprise that letters from Mr. Williams' friends and former colleagues likewise hail his dedication and support of them. See, e.g., November 19, 2024 Letter of Greg Kelisky, attached as Exhibit N ("One memory I have is at my parents' home ... when I needed help with yard work and Alan drove over with his equipment and began weed whacking my parents' yard").

For example, "lifelong friend[]" Don Whitaker, Jr., praises in his letter to the Court:

> I understand that Alan Glenn is facing serious charges, but this
> incident does not capture the essence of who Alan Glenn truly is,
> nor his positive influence on me and others. Alan Glenn saw
> potential in me and offered me my first job out of college in 1988.
> He always mentored with the utmost integrity, character and
> honesty, particularly in teaching others the securities business.
> During times of corporate change, he ensured that all members of
> our groups were placed accordingly. His concern for others and
> their well being is undeniable. ... He is an amazing person in so
> many ways and has been pivotal in guiding me in my early career.
> I am so grateful to him and for all he has done and consider him
> part of my extended "forever" family.

JEFFREY LICHTMAN

Hon. Paul G. Gardephe
United States District Judge
January 15, 2025
Page 15

Ltr of Don Whitaker, Jr., Ex. H. Similarly, Michael Landis informs in his letter of the support and mentoring that he also received from Mr. Williams:

> The first time I talked to Alan was when I was 23 and working at a competing firm. Alan always asked how I was doing, where I was from, what I was up too. I was young and Alan was a senior manager and to have someone of his stature make time for me helped give me confidence at my first job. <u>This small chatter led to a friendship/mentor relationship where I asked for advice many times in my life</u>. After the financial crisis in '07 I was struggling and house under foreclosure Alan continued to be my friend and advised me to keep my head down and keep grinding. He would say hard work is eventually rewarded.
>
> In 2010 I was out of the stock market business and working with my brothers in a construction business. <u>Alan helped at the beginning because he believed in me even though it was a completely different business.</u> He saw my potential that I didn't know I had and now 15 years later we have become the city of Portland's top construction contractor 3 out of the last 5 years. It has led me to be the manager and give the same belief I was given to a team of 70 diverse employees. <u>My company hasn't lost a superintendent or foreman in over 10 years because like Alan taught me, I take the time to know my employees, believe in them, and understand what they need to be successful.</u>

Ltr. of Michael Landis, Ex. D (emphasis supplied).

Ariane Wirth recalls that when her father passed way, Mr. Williams checked on her regularly, adding: "he was supportive through the entire period of time with his calm assurance that I was going to get through this rough period in my life." Ltr. of Ariane Wirth, Ex. G. And of the support she received from Mr. Williams after her eldest son was diagnosed with cancer, Lea Thone adds:

> In August 2018, my oldest son, Eli, was diagnosed with Osteosarcoma cancer at just 17 years old. In the 4 ½ year cancer battle my son had, Alan was always concerned about my son and would ask about his well-being often. After traditional cancer treatments did not work for Eli, we participated in two different clinical trials at Seattle Children's Hospital that required staying in

JEFFREY LICHTMAN

Hon. Paul G. Gardephe
United States District Judge
January 15, 2025
Page 16

> the city for 2 ½ months. As a single, self-employed mom, I was not able to afford lodging for these trials ... Alan knew about this situation and offered to help cover the lodging costs. <u>Without Alan's help, we would not have been able to afford to participate in the clinical trials, which I believe helped give my son more time on this earth</u>.

Ltr. of Lea Thone, Ex. E (emphasis supplied).

Finally, Devin Williams summarizes his observations of his father's support of others in his letter, writing:

> Throughout my entire life Alan Williams has been my support and I watched him support others outside the circle which included co-workers, friends, extended family, even strangers. Some would be hesitant, but he gave everyone a chance if it came down to business. <u>I have seen him help a friend that was about to lose his home. I have seen him mentor many people in the stock market. Trying to get a person to succeed so they can start a future for themselves</u>. He gave my cousin his truck, wasn't brand new but made sure it was reliable, new tires. My cousin still drives that truck today, over 15 years old. It was a vehicle to work. The support that I was given was always offered to many others as well.

Ltr. of Devin Williams, Ex. J (emphasis supplied).

### A Valued Member of the Community

In addition to Mr. Williams' dedication to friends, colleagues and family members, multiple submitted letters reference his commitment to his community. See, e.g., Ltr. of Michael Landis, Ex. D ("commitment [to] helping less fortunate people in our community"). For example, Bryan Greear lauds:

> One anecdote or story that speaks to his good will or deeds is his support of the local church and Christian school the kids attend. Alan had always been very supportive of both church and school activities, and generous in the local community by participating and helping with various charity and social activities.

Ltr. of Bryan Greear, Ex. L. Karen Williams similarly recounts in her letter:

**JEFFREY LICHTMAN**

Hon. Paul G. Gardephe
United States District Judge
January 15, 2025
Page 17

> Alan is an active member of our community, always willing to lend a helping hand and make[] a positive impact. One example is Alan's willingness to help with yard work at our church and bringing one of our sons to pitch in. Alan is respected and admired by his peers for his hard work, integrity, and kindness. He gives to our local church community for special children's needs ....

Ltr. of Karen Williams, Ex. I.

Finally, Brian Williams provides an instance when he came to fully realize his father's dedication to charity in his letter to Your Honor:

> After he was arrested, I went to his beach house get it ready to sell, since he would not return after being arrested which is one example of his self-punishment that I admire. I noticed on the counter stacks of unopened mail, so I decided to look at the letters and to my surprise 75% of the mail was charity donations and pledges and a lot of them! ... He took it upon himself to use his beach house for mail only for charitable donations no other bills not even utilities for the house itself was in the stack of unopened mail. I believe it was unopened because he didn't want to receive praise for his kind actions that would have made him feel uncomfortable. It was his way to keep his charitable contributions very private.

Ltr. of Brian Williams, Ex. K.

JEFFREY LICHTMAN

Hon. Paul G. Gardephe
United States District Judge
January 15, 2025
Page 18

### F. CONCLUSION

Defendant Alan Williams comes before this Court asking for mercy. A life filled with hard work and dedication to his family and friends will be forever tarnished by his criminal choices. Nevertheless, as the powerful enclosed letters reveal, Mr. Williams is an uncommonly decent and giving man who unlike many defendants has made extraordinary efforts to help others throughout his life, when no one was watching, when he had no need to impress a judge deciding his fate. For these reasons and the others stated herein – ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ – a non-custodial sentence is respectfully requested.

Respectfully submitted,

*/s/ Jeffrey Lichtman*
Jeffrey Lichtman
Jeffrey Einhorn

Encs.

cc: Jason Richman, Esq.
     Assistant United States Attorney (by ECF)